CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 2 9 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **KATHY RUELAS,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00030 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: Glen M. Williams |
| **Commissioner of Social Security,** | ) | Senior United States District Judge |
| Defendant. | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Kathy Ruelas, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Ruelas's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a

-1-

reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ruelas protectively filed her current applications[1] for SSI and DIB on September 2, 2005, alleging disability as of July 30, 2005,[2] due to nerve damage in the legs and arms, neck pain, disc problems in her back, high blood pressure and high cholesterol. (Record, ("R."), at 215-19, 234, 418-21.) The claims were denied initially and upon reconsideration. (R. at 191-98, 200-03, 422-33.) Ruelas then requested a hearing before an administrative law judge, ("ALJ"). (R. at 204-05.) The ALJ held a hearing on October 18, 2006, at which Ruelas was present and was represented by counsel. (R. at 456-95.)

By decision dated December 20, 2006, the ALJ denied Ruelas's claims. (R. at 17-29.) The ALJ found that Ruelas met the disability insured status requirements of the Act for DIB purposes through December 31, 2009. (R. at 21.) The ALJ also found that Ruelas had not engaged in any substantial gainful activity since the

---

[1] The court notes that Ruelas filed previous applications for SSI and DIB in September 2004. (R. at 70-78, 151-59.) These applications were denied by an ALJ on July 29, 2005, (R. at 177-87), and the Appeals Council subsequently denied review of the ALJ's decision. (R. at 36-40.) The Appeals Council's ruling was not appealed to this court.

[2] Ruelas's alleged onset date was amended at the hearing from August 12, 2004, to July 30, 2005, the day following the previous ALJ's decision. (R. at 462-63.)

-2-

amended alleged onset date. (R. at 21.) The ALJ determined that the medical evidence established that Ruelas suffered from a severe combination of impairments, namely degenerative joint and disc disease of the lumbosacral spine, degenerative joint disease of the bilateral knees and hypertension. (R. at 21.) However, the ALJ found that Ruelas did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) The ALJ determined that Ruelas retained the residual functional capacity to perform light work[3] that involved no climbing of ladders, ropes or scaffolds and only occasional balancing, stooping, kneeling, crouching, crawling and using or climbing stairs or ramps. (R. at 25.) In finding that Ruelas could perform light work, the ALJ specifically noted that Ruelas could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk and sit for approximately six hours in a typical eight-hour workday. (R. at 25.) The ALJ also found that Ruelas was capable of performing her past relevant work as a sheet folder and as a sewing machine operator. (R. at 28.) The ALJ noted that the above-mentioned occupations did not require the performance of work-related activities precluded by the residual functional capacity findings. (R. at 28.) Thus, the ALJ concluded that Ruelas was not under a disability as defined in the Act and was not entitled to benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Ruelas pursued her administrative appeals

---

[3]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

and sought review of the ALJ's decision, (R. at 16), but the Appeals Council denied her request for review. (R. at 10-13.) Ruelas then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2008).

## II.  Facts

Ruelas was born in 1950, (R. at 215, 230, 418), which classifies her as a "person of advanced age" under 20 C.F.R. §§ 404.1563(e), 416.963(e).  According to the record, Ruelas has a ninth-grade education, which classifies her as a person with a "limited education" under 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).  She has past relevant work experience as a sewing machine operator and as a sheet folder in a fabric factory.  (R. at 235-36.)

At the hearing before the ALJ on October 18, 2006, Ruelas testified that she was last employed as a quality auditor at a fabric factory.  (R. at 464.)  She explained that when she first started at the factory, the job required her to fold and check sheets. (R. at 464.)  Then, more than two years later, she was promoted to the position of quality auditor.  (R. at 464.)  Ruelas testified that the job required her to lift, stretch and bend, noting that she also was required to lift 25 to 30-pound boxes.  (R. at 464.) She further testified that she was required to stand during most of her eight-hour shift, indicating that she was given three breaks ranging from five to 15 minutes each during the course of the workday.  (R. at 465.)  Ruelas indicated that she worked in a yarn factory prior to her work at the fabric factory.  (R. at 465.)  She stated that the job required work with large spindles of yarn.  (R. at 465.)

-4-

Ruelas testified that she was unable to work due to problems with her back, shoulder and legs. (R. at 465.) She further testified that if she "stoop[ed] down, [she had] to find something to pull [herself] up with or else [she had] to get down on the floor and push [herself] up." (R. at 465.) Ruelas explained that she experienced back, shoulder and neck pain. (R. at 465-66.) However, according to Ruelas, once she experienced leg numbness, in addition to the pain, she decided that she needed to see a doctor. (R. at 466.) Ruelas testified that she was informed that she had deteriorating discs. (R. at 466.) She commented that she was sent to a specialist for further testing, but explained that she could not afford to have all of the testing performed. (R. at 466.)

Ruelas described her back pain as constant and feeling "like [its] pinched." (R. at 466.) She stated that, when sitting, standing or riding in a vehicle for extended periods, she had to take pain medication. (R. at 466.) Ruelas noted that her pain worsened at night, forcing her to sleep in a chair in the upright position. (R. at 466.) She also indicated that the pain affected her sleep patterns, noting that she sometimes "walk[ed] the floor" at night. (R. at 466.) Ruelas stated that she had to sit down and press her back up against something to alleviate the pain. (R. at 467.) She reiterated that she often slept in a recliner and indicated that she also had to use her recliner during the day. (R. at 467.) Ruelas testified that she stayed in her recliner most of the day, noting that she usually tried to get up to fix her son a meal one time per day. (R. at 467.) Although Ruelas stated that she spent most of the day in her recliner, she explained that her condition forced her to get up and walk periodically because sitting for extended periods caused pain. (R. at 468.) She again referenced her poor sleep patterns and stated that she had been prescribed medication to help her rest better.

Case 2:08-cv-00030-GMW-PMS   Document 19   Filed 01/29/09   Page 5 of 31   Pageid#: 66

(R. at 468.) Ruelas indicated that her poor sleep patterns caused fatigue during the day. (R. at 468.)

Ruelas testified that her leg pain felt like a needle being stuck into her leg, noting that the pain radiated down to the knee. (R. at 468.) She explained that her leg pain made it difficult to stand because it felt like her legs were going to give out. (R. at 468.) She stated that she had fallen in the past due to her leg giving out. (R. at 468.) Ruelas commented that she also fell when carrying her eight-month old grandson, noting that he weighed approximately 13 pounds at that time. (R. at 469.) With regard to her shoulder and arm problems, Ruelas stated that holding things caused pain in her neck and shoulders. (R. at 469.) Ruelas testified that she also experienced very bad headaches, which she partially attributed to nerves. (R. at 469.) She further testified that her bad headaches usually last two to three days. (R. at 469.) She remarked that she used to take medication to treat the headaches, but explained that she now simply lies in a dark room to alleviate the pain. (R. at 470.)

Ruelas testified that she left her last place of employment because her supervisor told her that she needed to have everything clear with her back and leg before she could resume her job, which required moving heavy boxes. (R. at 472.) She also testified that she previously worked as a sewing machine operator and as a caregiver. (R. at 475.) Ruelas stated that she cared for an older lady, noting that the job required her to help the lady in and out of her bed and wheelchair. (R. at 476.)

Ruelas testified that, if she was currently employed at the fabric factory, she would be unable to lift due to her back, shoulder and arms. (R. at 478.) She also

-6-

explained that her leg problems would cause difficulties, indicating that the required standing and bending would be difficult. (R. at 479.) She opined that the factory probably would not take her back because of her condition. (R. at 479.)

Bonnie Martindale, a vocational expert, also was present and testified at Ruelas's hearing. (R. at 481-94.) Martindale identified Ruelas's work at the fabric factory in quality control as medium[4] and semiskilled. (R. at 485.) She then testified that Ruelas's work as a sheet folder at the fabric factory was light and unskilled. (R. at 485.) Martindale also referenced Ruelas's past work as a material handler in the textile industry, noting that it was classified as heavy,[5] semiskilled work. (R. at 485.) Additionally, Ruelas's past work as a sewing machine operator was classified as light, semiskilled work, while her work in the yarn factory was classified as medium, semiskilled work. (R. at 486.) Martindale further testified that Ruelas's work as a caregiver was medium, semiskilled work. (R. at 486.) Martindale noted that Ruelas had no transferable job skills. (R. at 488.)

The ALJ then asked Martindale to consider a hypothetical individual that could perform light work, specifically one who could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2008).

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, she also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2008).

Case 2:08-cv-00030-GMW-PMS   Document 19   Filed 01/29/09   Page 7 of 31   Pageid#: 68

pounds, stand and/or walk and sit for at least six hours in a typical eight-hour workday and who was unlimited in their ability to push/pull, with the exception of the lifting and carrying limitations. (R. at 488.) In addition, such an individual would be limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. (R. at 488.) Based on the hypothetical set forth, Martindale testified that such an individual would be able to perform Ruelas's past work as a sheet folder and as a sewing machine operator. (R. at 489.) However, Martindale testified that if the ability to stand and walk was limited to less than four hours in a typical eight-hour workday, then such an individual would not be able to perform Ruelas's past work as a sheet folder. (R. at 490.) Martindale stated that if the standing and walking limitations were reduced, then the ability to sit would be at full range, noting that the hypothetical individual would be able to perform Ruelas's past work as a sewing machine operator. (R. at 491.)

Upon questioning from Ruelas's counsel, Martindale testified that if someone could only stand for two to three hours during an eight-hour shift, then that individual would be limited to the sedentary exertional level. (R. at 492.) Martindale acknowledged that, generally, a sewing machine operator job required use of the feet and legs to operate a pedal, but stated that she was not certain if the newer machines had a foot pedal control. (R. at 492.) Ruelas's counsel asked whether an individual who had difficulty using their legs to repetitively push pedals would be able to perform the job of a sewing machine operator. (R. at 492.) Martindale noted that a sewing job would only require use of the ankle range. (R. at 492.) As a result, Ruelas's counsel rephrased his question and asked if an such individual could perform the job in question if that person had difficulty using the ankle in a repetitive

-8-

activity. (R. at 492.) Martindale acknowledged that such a limitation would cause problems in the performance of the sewing operator job. (R. at 493.) Furthermore, she also acknowledged that an individual's ability to work as a sewing machine operator would be negatively impacted if the individual had difficulty twisting, bending and reaching forward on a repetitive basis. (R. at 493.) Martindale testified that the job as a sewing machine operator would not provide for a sit-stand option. (R. at 494.) Martindale also testified that if an individual were absent from work more than one a half to two days per month, then the individual's job would likely be in jeopardy. (R. at 493.)

In rendering his decision, the ALJ reviewed medical records from Dr. Christopher Von Elte, M.D.; Danville Regional Medical Center; Dr. Jonathan Krome, M.D.; Dr. Lawrence F. Cohen, M.D.; Family Healthcare Center; Dr. David C. Williams, M.D., a state agency physician; Dr. Robert R. Chaplin Jr., M.D., a state agency physician; Dr. Robert Cassidy, M.D.; Foothills Orthopedic Clinic; Dr. Jeffrey P. Crittenden, M.D.; The Neurology Clinic of Danville; Danville Diagnostic Imaging Center; Dr. Daniel P. Cahill, M.D.; Dr. Geoffrey E. Starr, M.D.; Dr. Paul Lance Walker, D.O.; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Mohammed Nazmul, M.D.; Health Centers of the Piedmont; and Free Clinic of Danville.[6]

After a review of the medical records, it is obvious that there is a rather

---

[6]The claimant's counsel submitted evidence following the ALJ hearing to the Appeals Council from the Free Clinic of Danville. Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

-9-

substantial amount of medical evidence from the time period prior to Ruelas's amended alleged onset date of July 30, 2005. Thus, in summarizing the medical records, the court will focus on the time period relevant to Ruelas's current applications for SSI and DIB, i.e. from July 30, 2005, through the date of the ALJ's decision. Any medical records summarized within this opinion not relevant to that time period are included only for clarity of the record and to fully represent the extent of Ruelas's impairments and treatment.

Ruelas was treated at Danville Regional Medical Center, ("Danville Regional"), on August 12, 2004, with complaints of right knee pain. (R. at 120-25.) Ruelas was diagnosed with right knee pain and elevated blood pressure. (R. at 122.) An x-ray of the right knee showed no obvious fracture and no acute process, but there was a question of bony fragment along the anterior surface of the lateral condyle on the sunrise view. (R. at 122-24.) No associated soft tissue swelling or joint effusion was noted. (R. at 124.) Ruelas was prescribed Lortab to treat the pain. (R. at 125.)

Ruelas was treated by Dr. Jonathan Krome, M.D., in August and September 2004. (R. at 130-31.) On August 19, 2004, Ruelas reported numbness, tingling and significant pain in the right leg. (R. at 131.) At this particular visit, Ruelas reported no back pain. (R. at 131.) Upon examination, Dr. Krome noted that Ruelas was hypersensitive to even light touching over the right lateral thigh. (R. at 131.) Ruelas complained of a pins and needles sensation. (R. at 131.) Dr. Krome reported mild weakness with hip flexion and the hip abductor on the right side when compared to the left side. (R. at 131.) A neurovascular exam in the lower extremity was symmetric, Ruelas's strength was excellent and she had a negative straight leg raising

test. (R. at 131.) Ruelas's back and sacroiliac joint were not tender. (R. at 131.) Dr. Krome suggested nerve testing to determine if the pain was radicular or neuropathy. (R. at 131.)

On August 27, 2004, upon referral from Dr. Krome, Dr. Geoffrey E. Starr, M.D., performed nerve conduction studies on Ruelas. (R. at 127-28.) The nerve conduction studies were normal and an electromyogram, ("EMG"), revealed denervation changes in the muscles. (R. at 128.) The electrodiagnostic impression showed findings consistent with a mild right-sided L4 radiculopathy and the clinical impression indicated that there was EMG evidence of L4 radiculopathy, which possibly was caused by degenerative disc disease of the lumbosacral spine. (R. at 128.) In addition, foraminal disease at the L4-L5 level or posterorlateral disease at the L3-L4 level was suspected. (R. at 128.) Dr. Starr advised Ruelas to follow up with Dr. Krome and recommended a magnetic resonance imaging, ("MRI"), of the lumbosacral spine. (R. at 128.)

Ruelas saw Dr. Krome for a follow-up appointment on September 2, 2004, complaining of continued pain in the lower back and right leg. (R. at 131.) A straight leg raising test was negative, but Ruelas had weakness in her great toe dorsiflexor. (R. at 131.) The remainder of her foot had good strength. (R. at 131.) She was diagnosed with radicular pain and an MRI of the lumbosacral spine was ordered. (R. at 131.) The MRI revealed multilevel degenerative disc disease, minimal grade I spondylolisthesis of L5 on S1, which may have been related to spondylolysis, but it was not clear. (R. at 126.) It was noted that a computerized axial tomography, ("CT"), scan could be performed if it was deemed necessary. (R. at 126.) The only

-11-

asymmetric findings were on the left at L3-L4, where there was a small left foraminal disc herniation. (R. at 126.) There were no asymmetric findings to the right and no significant spinal stenosis was noted. (R. at 126.) On September 7, 2004, after reviewing the MRI, Dr. Krome discussed the findings with Ruelas and referred her to Dr. Lawrence F. Cohen, M.D. (R. at 130.)

Specifically, Ruelas was referred to Dr. Cohen for evaluation of her right leg pain and lower back pain. (R. at 132-33.) By letter dated September 20, 2004, Dr. Cohen indicated that, according to Ruelas, in July 2004, she began experiencing pain in her back that radiated down to her right leg. (R. at 132.) Ruelas also reported numbness and weakness. (R. at 132.) Dr. Cohen noted that Ruelas's EMG showed right-sided L4 radiculopathy and that an MRI was inconclusive, except for some degenerative disc disease and spondylolisthesis. (R. at 132.) Upon physical examination, Ruelas was alert and oriented and was observed to ambulate without a gait disturbance, antalgic gait or ataxia. (R. at 132.) Dr. Cohen noted that Ruelas had a painful and restricted range of motion of the lumbar spine, as well as right sciatic notch tenderness. (R. at 132.) Ruelas had a full range of motion of the hip and knee, without any symptomatology. (R. at 132.) Flexion and extension of the neck did not reproduce any symptoms and Ruelas's upper extremity strengths were within normal limits. (R. at 132.)

After reviewing the September 2, 2004, MRI, Dr. Cohen noted that he could not see any evidence of foraminal stenosis, except for the left side of L4-L5. (R. at 132.) He further noted that Ruelas was not having any left leg pain. (R. at 132.) Dr. Cohen indicated that Ruelas had some isthmic spondylolisthesis at L5-S1, but

-12-

explained that it did not translate or angulate on flexion or extension. (R. at 132.) Dr. Cohen recommended that Ruelas have a CT myelography performed to make sure that she did not have any truncation of the nerve root that was not showing up on her MRI. (R. at 132.) He further noted that he recommended some physical therapy with heat, ultrasound and strengthening exercises for a four-week period. (R. at 133.) Dr. Cohen noted that if Ruelas's CT myelogram did not show any reasons for her problems, he would then recommend a CT of the pelvis and abdomen. (R. at 133.)

Ruelas was treated at Family Healthcare Center of Gretna from March 23, 2004, to September 29, 2004. (R. at 135-43, 347-55.) During this time period, Ruelas complained of congestion, breathing difficulties, right leg pain and numbness and sleep difficulties. (R. at 135-43, 347-55.) Ruelas's medical assessments included high cholesterol, hypertension, lower back pain, degenerative disc disease of the lumbar spine, right leg pain, obesity and bronchitis. (R. at 135-43, 347-55.)

On October 14, 2004, Dr. David C. Williams, M.D., completed a Physical Residual Functional Capacity Assessment, ("PRFC"), finding that Ruelas could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk and sit for about six hours in a typical eight-hour workday, with an unlimited ability to push and/or pull. (R. at 144-50.) In addition, Dr. Williams determined that Ruelas could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 146.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 146-47.) Dr. Williams concluded that Ruelas's allegations were only partially credible. (R. at 149.) His findings were affirmed by Dr. Robert R. Chaplin Jr., M.D. on December

2, 2004.  (R. at 150.)

On December 5, 2005, Ruelas underwent a consultative examination by Dr. Paul Lance Walker, D.O.  (R. at 357-62.)  Ruelas complained of neck and back pain, noting that, at the time of the examination, she had experienced lower back, neck and shoulder pain for approximately one year.  (R. at 357.)  She did not attribute the pain to any injury, but stated that the pain had been intermittent over the years, explaining that in the year leading up to the visit it had been a "stabbing-type pain."  (R. at 357.)  Ruelas indicated that the pain did not radiate to her legs, but that it instead radiated to her tailbone.  (R. at 357.)  Ruelas informed Dr. Walker that she had some nerve damage in her leg, secondary to her back problems.  (R. at 357.)  Dr. Walker also noted that Ruelas had been diagnosed with degenerative disc disease.  (R. at 357.)  Ruelas also reported that her pain worsened with activity.  (R. at 357.)  Ruelas stated that she had experienced neck and shoulder pain for approximately one year, which resulted from boxes falling on her.  (R. at 358.)  Dr. Walker noted that Ruelas was attending physical therapy and that, at that time, no MRI or x-ray of the neck had been performed.  (R. at 358.)  Ruelas reported pain caused by raising her left shoulder.  (R. at 358.)  She described the pain as a "dull aching-type pain," noting that nothing made the pain better or worse.  (R. at 358.)  Lastly, Ruelas reported a history of high blood pressure, which was controlled by medication.  (R. at 358.)

Ruelas alleged that her problems limited her activities of daily living.  (R. at 358.)  She stated that she could walk for approximately one block, stand for 30 minutes and lift less than 20 pounds.  (R. at 358.)  Ruelas acknowledged that she was able to drive short distances.  (R. at 358.)  She stated that she was able to go to the

-14-

bathroom, shower, dress, feed herself, tie her shoes, button her clothes, write, turn a doorknob, pick up coins, pens, keys and open jars. (R. at 358.) Ruelas also reported that she was able to cook, wash dishes, make her bed, do laundry, go the grocery store and that she could sometimes sweep. (R. at 358.) However, she stated that she did not vacuum, mop or perform yard work, and she indicated that she did not have any hobbies. (R. at 358.)

A review of systems showed that Ruelas was positive for swelling in her feet and legs, and showed arthralgias in her back and shoulder. (R. at 359.) Dr. Walker also noted that Ruelas had some left-sided chest pain. (R. at 359.) Upon examination, Dr. Walker noted that Ruelas sat comfortably, walked without difficulty and was able to get on and off the exam table without difficulty. (R. at 359-60.) No inconsistencies or poor efforts were noted, Ruelas was alert and oriented with a normal affect and she was in no acute distress. (R. at 360.) A neurological exam was unremarkable. (R. at 360.) Dr. Walker reported the presence of a right-sided paravertebral muscle spasm, but noted no tenderness, other fusions or deformities. (R. at 361.) Ruelas had normal flexion and extension of her neck. (R. at 361.) She had a decreased right rotation to about 50 degrees and her left rotation was about 60 degrees. (R. at 361.) Ruelas's right and left lateral bending were both normal. (R. at 361.) She was able to abduct and forward elevate her shoulders to about 110 degrees bilaterally, and her internal and external rotations were both normal. (R. at 361.) The remaining examination revealed a normal range of motion in her elbows, forearms, hips, back, knees, ankles, feet, wrists, hands and fingers. (R. at 361.)

Dr. Walker diagnosed Ruelas with hypertension, neck and shoulder pain and

-15-

degenerative disc disease in her back. (R. at 361.) He determined that Ruelas appeared to have some difficulties with degenerative disc disease in her back, as well as poorly controlled hypertension. (R. at 361.) Based upon these problems, Dr. Walker opined that Ruelas could stand and walk for less than four hours in a typical eight-hour workday and sit up for six hours in a typical eight-hour workday. (R. at 361.) Dr. Walker also noted that there was no medical need for an assistive device. (R. at 361.) He further found that Ruelas could frequently lift and/or carry items weighing up to 10 pounds and occasionally lift and/or carry items weighing up to 20 pounds. (R. at 361.) Dr. Walker determined that Ruelas would have difficulty with frequent bending, stooping or crouching, but noted that she should not have any difficulty with reaching, handling, feeling, grasping or fingering, except with a rare type of work with decreased range of motion of the neck and the shoulders. (R. at 361.) He noted no other relevant visual, communicative, workplace or environmental limitations. (R. at 361.) Dr. Walker advised Ruelas to immediately follow up with her treating physician. (R. at 361-62.)

Ruelas was treated by Dr. Mohammed Nazmul, M.D., at the Health Centers of the Piedmont from October 18, 2005, to May 8, 2006. (R. at 383-96.) On October 18, 2005, Ruelas complained of a history of back pain and disc disease. (R. at 391.) She indicated that her back pain sometimes worsened after walking for extended periods. (R. at 391.) Ruelas also reported knee pain, arthritis, occasional headaches, anxious feelings and stress. (R. at 391.) A physical examination revealed normal strength in the upper and lower extremities and a leg raise test was negative for any shooting pain in the legs. (R. at 391.) However, some crepitus was felt on both legs, particularly on the left leg. (R. at 391.) There was some tenderness in the lower

-16-

back, mainly on the left side. (R. at 391.) Dr. Nazmul also observed some tenderness in the middle of the spine area of the lower back, but he noted no swelling in the spine. (R. at 391.) Dr. Nazmul's assessment revealed back pain and hypertension. (R. at 391.) He prescribed Ultram, Metoprolol and hydroxyzine. (R. at 391.) It was recommended that Ruelas follow up within six to eight weeks regarding her back pain and anxiety. (R. at 391.) Dr. Nazmul advised Ruelas to exercise, diet and lose weight. (R. at 391-92.)

Ruelas returned for a follow-up appointment on December 13, 2005. (R. at 389.) Ruelas indicated that she needed medication refills. (R. at 389.) She denied any headache, chest pain or breathing problem. (R. at 389.) Ruelas reported that she had recently been stressed due to the death of a grandchild. (R. at 389.) She indicated that Ultram had helped with her back and knee pain. (R. at 389.) An examination of the knees revealed some tenderness around the left knee, but there appeared to be no pain in the right knee. (R. at 389.) There was some mild crepitus on both knees and the strength was normal in the lower extremities. (R. at 389.) Dr. Nazmul's assessment included hypertension and stress/anxiety. (R. at 389.) Ruelas had been non-compliant with her blood pressure medication and Dr. Nazmul reiterated the importance of her daily medication. (R. at 389.) Dr. Nazmul reported a component of situational stress; thus, he increased her hydroxyzine dosage to treat her stress, anxiety and sleep difficulties. (R. at 389.) Dr. Nazmul also continued Ruelas on Ultram to treat her back and knee pain and advised her to also take Tylenol and Motrin. (R. at 389.) Dr. Nazmul advised Ruelas that her blood pressure had to be stable before she could take the recommended additional medications. (R. at 389.) Ruelas was again encouraged to exercise and diet. (R. at 389.)

-17-

On January 4, 2006, Dr. Williams completed another PRFC. (R. at 363-69.) Dr. Williams's findings were identical to his previous PRFC assessment with the exception of one finding. (R. at 365.) Instead of finding that Ruelas could only occasionally climb, he found that Ruelas could occasionally use ramps and climb stairs, but that she should never climb ladders, ropes or scaffolds. (R. at 365.) Dr. Williams explained that he considered the medical opinion of Dr. Walker, who found that Ruelas was limited to standing and/or walking for less than four hours in a typical eight-hour workday. (R. at 369.) However, Dr. Williams noted that he did not agree with Dr. Walker's findings, due to the fact that Ruelas had normal motor strength and no need for an assistive device. (R. at 369.) On March 2, 2006, Dr. Chaplin affirmed Dr. Williams's findings. (R. at 369.)

On February 6, 2006, Ruelas presented to Dr. Nazmul for a follow-up appointment. (R. at 386.) She received the results from blood testing, which revealed hypertension, elevated triglycerides and elevated LFTs. (R. at 386.) Dr. Nazmul increased Ruelas's Metoprolol dosage and continued her Tramadol and Voltaren. (R. at 386.) She also was prescribed Zoloft to treat her anxiety and depression. (R. at 386.) On May 8, 2006, Ruelas presented and reported that she was stressed. (R. at 383.) She indicated that she had not filled the Zoloft prescription yet, but noted that she was taking her blood pressure medication appropriately. (R. at 383.) Ruelas reported occasional pain in her back, which she said she treated with Ultram. (R. at 383.) She was diagnosed with hypertension and elevated triglycerides. (R. at 383.) Ruelas was continued on Ultram and Diclofenac. (R. at 383.)

On March 2, 2006, Stephen P. Saxby, Ph.D., a state agency psychologist,

competed a Psychiatric Review Technique form, ("PRTF"), finding that Ruelas did not suffer from a severe mental impairment. (R. at 370-82.) Saxby noted that Ruelas suffered from anxiety, but noted that it was a medically determinable impairment that did not precisely satisfy the required diagnostic criteria. (R. at 375.) Saxby found that Ruelas was not limited in her activities of daily living or in maintaining social functioning. (R. at 380.) However, he found that Ruelas was mildly limited in maintaining concentration, persistence or pace. (R. at 380.) Saxby noted no episodes of decompensation. (R. at 380.) Based on a review of the evidence, Saxby concluded that Ruelas's allegations were not credible. (R. at 382.)

On July 17, 2006, Ruelas was treated at Health Centers of the Piedmont for a follow-up appointment regarding her chronic back pain. (R. at 414.) Ruelas also requested that a disability form be completed. (R. at 414.) A physical examination showed no significant back tenderness and her legs were neurovascularly intact. (R. at 414.) Once again, Ruelas was diagnosed with hypertension, hyperlipidemia and chronic low back pain. (R. at 414.) Her Benazepril dosage was increased, she was prescribed Lipitor, her request for a refill of Ultram was refused, she was advised to discontinue Voltaren and Lodine was suggested instead. (R. at 414.)

Ruelas was treated at the Free Clinic of Danville from February 27, 2007, to March 13, 2007. (R. at 435-36.) She was treated for hypertension and degenerative disc disease. (R. at 435-36.) Ruelas reported improvement in her right-sided movement and pain, and she also reported that her back was doing "a little better." (R. at 435-36.)

-19-

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 20, 2006, the ALJ denied Ruelas's claim. (R. at 17-29.) The ALJ found that Ruelas met the disability insured status requirements of

the Act for DIB purposes through December 31, 2009. (R. at 21.) The ALJ also found that Ruelas had not engaged in any substantial gainful activity since the amended alleged onset date. (R. at 21.) The ALJ determined that the medical evidence established that Ruelas suffered from a severe combination of impairments, namely degenerative joint and disc disease of the lumbosacral spine, degenerative joint disease of the bilateral knees and hypertension. (R. at 21.) However, the ALJ found that Ruelas did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) The ALJ determined that Ruelas retained the residual functional capacity to perform light work that involved no climbing of ladders, ropes or scaffolds and only occasional balancing, stooping, kneeling, crouching, crawling and using or climbing stairs or ramps. (R. at 25.) In finding that Ruelas could perform light work, the ALJ specifically noted that Ruelas could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk and sit for approximately six hours in a typical eight-hour workday. (R. at 25.) The ALJ also found that Ruelas was capable of performing her past relevant work as a sheet folder and as a sewing machine operator. (R. at 28.) The ALJ noted that the above-mentioned occupations did not require the performance of work-related activities precluded by the residual functional capacity findings. (R. at 28.) Thus, the ALJ concluded that Ruelas was not under a disability as defined in the Act and was not entitled to benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Ruelas argues that the ALJ's opinion is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"),

at 8-14.) In support of her argument, Ruelas claims that the ALJ failed to include certain physical limitations in his residual functional capacity determination. (Plaintiff's Brief at 8-11.) Additionally, Ruelas argues that the ALJ failed to accord proper weight to the findings of Dr. Walker, who examined Ruelas and performed a consultative examination, and that the ALJ improperly relied upon the findings of the state agency physicians. (Plaintiff's Brief at 12.) Lastly, Ruelas contends that, had the opinion of Dr. Walker been accorded the proper weight, a finding of disabled would have been required under the Medical-Vocational Guidelines. (Plaintiff's Brief at 12-13.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ

-22-

may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Ruelas's argument that the ALJ's decision is not supported by substantial evidence. Ruelas argues that the ALJ's residual functional capacity finding failed to include any limitations associated with her impairment of degenerative joint disease of the knees. (Plaintiff's Brief at 8-11.)

In this case, the ALJ determined that Ruelas retained the ability to perform work at the light exertional level, noting that she could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk for six hours in a typical eight-hour workday and sit for six hours in a typical eight-hour workday. (R. at 25.) The ALJ further found that Ruelas was unable to climb ladders, ropes or scaffolds, and that she could only occasionally perform other postural activities, such as climbing stairs/ramps, stooping, kneeling, crouching and crawling. (R. at 25.) In rendering his decision, the ALJ stated that he gave considerable weight to the previous ALJ's decision, noting that the evidence of record did not document significant changes in Ruelas's condition since the previous decision. (R. at 28.) As such, the ALJ concurred with, and adopted, the prior ALJ's finding regarding exertional capacity. (R. at 28.)

Ruelas notes that the previous ALJ limited her to work at the light exertional level, finding that she suffered from a single severe impairment, that of a back

-23-

disorder. However, Ruelas points out that, in this case, the ALJ noted that she suffered from a severe combination of impairments, namely degenerative joint and disc disease of the lumbosacral spine, degenerative joint disease of the bilateral knees and hypertension. Thus, according to Ruelas, she did indeed experience significant changes in her physical condition since the previous ALJ's decision, evidenced by the most recent ALJ opinion, which noted additional severe impairments. Ruelas contends that, despite a finding that her impairment of degenerative joint disease of both knees was severe, the ALJ failed to incorporate any limitations associated with the impairment in his residual functional capacity finding. Therefore, Ruelas argues that, based upon the medical evidence, as well as the finding that she suffered from a severe impairment of degenerative joint disease in both knees, the ALJ's residual functional capacity finding is unsupported because her impairments would adversely impact her ability to perform light work as found by the ALJ, and, thus, would render her unable to perform her past relevant work. After a review of the record, the undersigned finds that this argument is without merit.

As noted previously, when determining whether substantial evidence supports the Commissioner's decision, this court must ascertain whether the ALJ properly analyzed the evidence of record and whether he sufficiently explained his findings and rationale in crediting such evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In particular, the Commissioner "must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) In the case at hand, the ALJ specifically discussed all relevant evidence of record and noted the weight given to the relevant findings and opinions. It is obvious from a review of the medical records that Ruelas complained of, and was

-24-

diagnosed with, conditions such as degenerative disc disease, degenerative joint disease, hypertension, high cholesterol, as well as neck, back, shoulder and right leg pain. However, despite these diagnoses and conditions, the treatment records are devoid of any mention of significant limitations associated with these impairments.

Notably, since Ruelas's amended alleged onset date of July 30, 2005, her treatment records are rather unremarkable. For instance, on October 18, 2005, a physical examination by Dr. Nazmul revealed normal strength in the upper and lower extremities, and a leg raise test was negative for any shooting pain in the legs. (R. at 391.) Also, during a follow-up appointment on December 13, 2005, Ruelas reported to Dr. Nazmul that Ultram had helped her back and knee pain. (R. at 389.) While some tenderness and crepitus was noted, an examination revealed no pain in the right knee and normal strength in the lower extremities. (R. at 389.) Furthermore, on February 6, 2006, Ruelas reported only occasional back pain, noting that she treated the pain with Ultram. (R. at 383.) A physical examination at Health Centers of the Piedmont on July 17, 2006, showed no significant back tenderness and Ruelas's legs were neurovascularly intact. (R. at 414.) As recent as February 23, 2007, to March 13, 2007, during office visits at the Free Clinic of Danville, Ruelas reported improvement in her right-sided movement and pain, and she also indicated that her back was doing "a little better." (R. at 435-36.)

On October 14, 2004, Dr. Williams completed a PRFC, finding that Ruelas could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk and sit for about six hours in a typical eight-hour workday, with an unlimited ability to push and/or pull.

-25-

(R. at 144-50.)  In addition, Dr. Williams determined that Ruelas could occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 146.)  No manipulative, visual, communicative or environmental limitations were noted.  (R. at 146-47.)  Dr. Williams concluded that Ruelas's allegations were only partially credible.  (R. at 149.)  His findings were affirmed by Dr. Chaplin on December 2, 2004.  (R. at 150.)

On December 5, 2005, Ruelas underwent a consultative examination by Dr. Walker.  (R. at 357-62.)  Dr. Walker diagnosed Ruelas with hypertension, neck and shoulder pain and degenerative disc disease.  (R. at 361.)  Based upon these impairments, Dr. Walker opined that Ruelas could stand and walk for less than four hours in a typical eight-hour workday and sit up for six hours in a typical eight-hour workday.  (R. at 361.)  Dr. Walker also noted that there was no medical need for an assistive device.  (R. at 361.)   He further found that Ruelas could frequently lift and/or carry items weighing up to 10 pounds and occasionally lift and/or carry items weighing up to 20 pounds.  (R. at 361.)  Dr. Walker determined that Ruelas would have difficulty with frequent bending, stooping or crouching, but noted that she should not have any difficulty with reaching, handling, feeling, grasping or fingering, except with a rare type of work with decreased range of motion of the neck and the shoulders.  (R. at 361.)  He noted no other relevant visual, communicative, workplace or environmental limitations.  (R. at 361.)  Dr. Walker advised Ruelas to immediately follow up with her treating physician.  (R. at 361-62.)

On January 4, 2006, Dr. Williams completed another PRFC.  (R. at 363-69.)  Dr. Williams's findings were identical to his previous PRFC assessment with the exception of one finding.  (R. at 365.)  Instead of finding that Ruelas could only

-26-

occasionally climb, he found that Ruelas could occasionally use ramps and climb stairs, but that she should never climb ladders, ropes or scaffolds. (R. at 365.) Dr. Williams explained that he considered the medical opinion of Dr. Walker, who found that Ruelas was limited to standing and/or walking for less than four hours in a typical eight-hour workday. (R. at 369.) However, Dr. Williams noted that he did not agree with Dr. Walker's findings, due to the fact that Ruelas had normal motor strength and no need for an assistive device. (R. at 369.) On March 2, 2006, Dr. Chaplin affirmed Dr. Williams's findings. (R. at 369.)

The ALJ gave great weight to the prior ALJ's residual functional capacity finding and to the opinions of state agency physicians Dr. Williams and Dr. Chaplin, each of whom found that Ruelas was capable of performing light work. After a review of the evidence of record, the undersigned is of the opinion that the ALJ was justified in according great weight to these opinions, as they were supported by substantial evidence within the record. As such, the court finds that the ALJ did not err in rendering his residual functional capacity finding.

The court recognizes that, in the most recent ALJ's decision, it was determined that Ruelas suffered from a combination of severe impairments, some of which were not included in the previous ALJ's decision. While the court is aware that this discrepancy does suggest that Ruelas's condition has changed since the previous decision, the court notes that both ALJs determined that Ruelas did not suffer from an impairment or combination of impairments that met or medically equaled on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Nonetheless, Ruelas contends that the additional impairments warrant further restrictions in the

ALJ's residual functional capacity finding. The court is of the opinion that the ALJ accounted for any limitations related to Ruelas's additional impairments by limiting her to light work that allowed only occasional climbing of stairs and ramps, stooping, kneeling, crouching and crawling, and that completely restricted her from the climbing of ladders, ropes and scaffolds. (R. at 25.) Moreover, as discussed above, the ALJ's residual functional capacity finding, and the limitations noted therein, were supported by substantial evidence within the record.

Next, Ruelas argues that the ALJ failed to accord proper weight to the findings of Dr. Walker and that the ALJ improperly relied upon the findings of the state agency physicians. (Plaintiff's Brief at 12.) This argument is also without merit.

According to Ruelas, if proper weight had been accorded to Dr. Walker's opinion that Ruelas could only stand and/or walk for a total of less than four hours in a typical eight-hour workday, then a finding of disability would have been warranted. Here, Dr. Walker performed a consultative examination at the request of Disability Determination Services. In general, the Commissioner is required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (2008). The court recognizes this accepted principle, however, Dr. Walker's one-time examination should not be accorded significant weight, as it was inconsistent with the remaining evidence of record. A medical opinion that is not supported by the clinical evidence or that is inconsistent with other substantial evidence, should be accorded significantly less weight. *See generally Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); 20 C.F.R. §§ 404.1527(d)(3)-(4),

-28-

416.927(d)(3)-(4). In this case, there are no treatment notes or records from any treating physicians that reference any limitations as severe as those noted by Dr. Walker regarding Ruelas's ability to stand and/or walk. Additionally, the state agency physicians, on two separate occasions, reviewed the relevant medical evidence and determined that Ruelas could stand and/or walk for approximately six hours in a typical eight-hour workday. Moreover, Dr. Williams and Dr. Chaplin agreed that Dr. Walker's findings were not supported because the records showed that Ruelas had normal motor strength and no need for an assistive device. (R. at 369.) Thus, the undersigned is of the opinion that the ALJ properly accorded less weight to Dr. Walker's opinion, as it was unsupported by, and inconsistent with, the evidence of record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(d)(3)-(4), 416.927(d)(3)-(4).

As previously discussed, Ruelas argues that the ALJ failed to properly consider her physical impairments, specifically degenerative joint disease of both knees, and how the impairments would affect her ability to perform work at the light level of exertion. The court has already determined that the ALJ's residual functional capacity finding was supported by substantial evidence. However, the court will now briefly discuss Ruelas's contention that, because the ALJ improperly considered the impact of her impairments on her ability to do work, the ALJ's determination that she could perform her past relevant work also must fail. According to the Regulations, light work "requires a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008). Thus, based upon this definition, Ruelas argues that her degenerative joint disease of both knees would clearly impact her ability to perform any light work and, in turn, prevent her from performing her past relevant

-29-

work. I disagree.

Both state agency physicians found that Ruelas was capable of standing and/or walking for approximately six hours in a typical eight-hour workday and that she was unlimited in her ability to push and/or pull. (R. at 144-50, 363-69.) In fact, the record contains no medical opinions suggesting that Ruelas was limited in her ability to push and/or pull with the lower extremities. Furthermore, based upon a hypothetical outlining the ALJ's residual functional capacity finding, the vocational expert testified that such an individual would be able to perform Ruelas's past work as a sheet folder and as a sewing machine operator. (R. at 489.) The vocational expert did recognize that, if such an individual's ability to stand and/or walk was limited to less than four hours in a typical eight-hour workday, as found by Dr. Walker, then that individual would not be able to perform Ruelas's past work as a sheet folder. (R. at 490.) The vocational expert also testified that if the standing and walking limitations were reduced, then the ability to sit would be at full range, noting that the hypothetical individual would be able to perform Ruelas's past work as a sewing machine operator because that occupation is performed in a sitting position. (R. at 491.) However, the court notes that the consideration of Dr. Walker's limitations on Ruelas's ability to perform her past relevant work is immaterial, as the ALJ properly rejected Dr. Walker's opinion, which, as explained previously, was inconsistent with the evidence of record. Accordingly, based upon the testimony of the vocational expert and the medical evidence, the ALJ did not err in finding that Ruelas could perform her past relevant work.

Lastly, Ruelas argues that, if Dr. Walker's opinion had been accorded proper

-30-

weight and it was determined that she was limited to sedentary work, a finding of disability would have been warranted pursuant to the Medical-Vocational Guidelines. (Plaintiff's Brief at 12-13.) However, because the undersigned has determined that the ALJ was justified in rejecting Dr. Walker's opinion, this argument is moot and will not be addressed by the court.

## IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Ruelas's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This _29th_ day of January 2009.

_Glen M. Williams_

————————————————————
THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-31-